**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**NORTHERN DIVISION**

| | |
|---|---|
| **COREY JOHNSON, on behalf of minor child S.J.,**<br><br>    Plaintiff,<br><br>vs.<br><br>**CACHE COUNTY SCHOOL DISTRICT, TERI CUTLER, DENISE MOURITSEN, DOUG SNOW, LORI REYNOLDS, KIRK MCCRAE, MIKE LIECHTY, and STEVEN NORTON,**<br><br>    Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>**Case No.  1:18CV57DAK**<br><br>**Judge Dale A. Kimball** |

    This matter is before the court on Plaintiff Corey Johnson's Motion for Temporary Restraining Order and Preliminary Injunction.  The parties fully briefed the motion on an expedited basis, and, on June 27, 2018, the court held an expedited hearing on the motion.  At the hearing, Plaintiff was represented by Angela H. Elmore, and Defendants were represented by Kyle J. Kaiser and Darin B. Goff.  The court heard testimony from S.J., had oral argument from counsel for both parties, and took the motion under advisement.  After carefully considering the parties' arguments, as well as the law and facts relevant to the motion, the court enters the following Memorandum Decision and Order denying Plaintiff's motion for preliminary injunctive relief.

## FACTUAL BACKGROUND[1]

On behalf of his minor daughter, S.J., who was dismissed from her high school cheerleading squad, Plaintiff Corey Johnson brought this §1983 civil rights action against Cache County School District, Teri Cutler, Principal of Mountain Crest High School, Denise Mouritsen, Assistant Principal of Mountain Crest High School, Doug Snow, Assistant Principal at Mountain Crest High School, Lori Reynolds, Cheerleading Advisor at Mountain Crest High School, Kirk McRae, Human Resources Director for Cache County School District, Mike Liechty, Deputy Superintendent, and Steven C. Norton, Superintendent of Cache County School District.

S.J. is a student at Mountain Crest High School in Cache County, Utah.  She tried out for Mountain Crest's cheerleading squad during the 2017-18 academic year and was accepted to the squad for the 2018-19 academic year.  While trying out for the squad, S.J. was given paperwork to review, sign, and return.  S.J. and her parents signed and returned the Cheer and Stunt Squad Constitution ("Cheer Constitution"), which has a provision that "[m]embers will be dismissed for improper social media usage."  The Cheer Constitution also required members of the squad to uphold all standards of the school constitution and conduct themselves appropriately at school and other schools because they are representing Mountain Crest wherever they go.

During a meeting prior to tryouts, Lori Reynolds, the cheer squad advisor, spoke at length about social media usage.  She explained to the potential cheerleaders that there was a history of inappropriate social media usage by Mountain Crest cheerleaders and it had escalated the

---

[1] The court notes that the findings of fact and conclusions of law made by a court in deciding a preliminary injunction motion are not binding at the trial on the merits.  *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *City of Chanute v. Williams Natural Gas Co.*, 955 F.2d 641, 649 (10th Cir. 1992), *overruled on other grounds, Systemcare, Inc. v. Wang Labs Corp.*, 117 F.3d 1137 (10th Cir. 1997) (recognizing that "the district court is not bound by its prior factual findings determined in a preliminary injunction hearing.").

sometimes violent rivalry Mountain Crest had with its neighboring high school, Ridgeline, and created conflict within Mountain Crest.  She also told the potential cheerleaders that the cheerleaders would need to clean up their social media and instructed the prospective cheerleaders not to post any derogatory or nasty comments, to refrain from bullying or any "catty" comments, and not to post anything that would do dishonor to themselves, their family, or their school.  Mountain Crest's cheerleading advisor expressed that the students would be representing the school and the students should be careful about what was posted.  Reynolds told the prospective cheerleaders that she intended to change the view others had of Mountain Crest's cheerleaders to minimize the rivalry with Ridgeline and reduce the conflict within Mountain Crest and the cheer squad.  Reynolds impression was that the students understood the parameters and that many students, including S.J., commented positively about the rule.

On March 15, 2018, after learning that she made the squad, S.J. returned to the school for an ice cream social and new member informational meeting the school held for the girls who had made the squad.  Mountain Crest's principal, Teri Cutler, one of Mountain Crest's vice presidents, Denise Mouritsen, and cheer coach Lori Reynolds were at the meeting.  At the meeting, the students were given Mountain Crest shirts.

The school administrators and Reynolds again warned the new squad members about proper social media usage.  Reynolds directed the new cheerleaders not to post anything about making the cheerleading squad to social media until the formal announcement of the cheerleading squad was made at a school assembly the following day.  The advisor reminded the students that students who were not selected would be disappointed and she told the students not to gloat about making the team.  S.J. claims that she and her friends E.W. and S.E.J. were never instructed not to post an announcement to social media, but they did remember a vague

instruction to "be nice."  However, the school officials and M.K., another new cheerleader, recalled the directive not to post until the assembly.  M.K. stated that the instruction made an impression on her because she had already posted to SnapChat that she had made the squad and she deleted her post after the meeting because of the instruction.  M.K. also recalled another new cheerleader, B.L., reminding the other students about how disappointing it had been for her not to make the squad the previous year and encouraging the group to follow Reynold's directions not to post anything to social media that night.

At the meeting, Principal Cutler spoke to the new cheerleaders about their obligation to be kind to other students and told them that "nice matters."  The principal also stated that there was a "zero tolerance" policy for violations of the cheer constitution and that violations would result in expulsion from the cheer squad.  The cheerleaders agreed to be positive on social media.

After the social, S.J. and four of her fellow cheerleaders decided to go to dinner to celebrate.  While they were driving to the restaurant in a private vehicle on public roads, S.J. recorded the girls singing along to some of the lyrics of Big Sean's song "I.D.F.W.U."  S.J. posted an eight-second video to her SnapChat story of the girls singing the following lyrics from the song: "I don't fuck with you, you little stupid ass bitch, I ain't fucking with you."  S.J. posted this video to a private story that included approximately thirty to forty of her contacts.  S.J. and the other girls were wearing the Mountain Crest cheer shirts that they were given at the ice cream social.  The school administrators could tell that the girls were wearing the Mountain Crest shirts and they believed that it would have been clear to any Mountain Crest student and some Ridgeline students that the girls were wearing Mountain Crest cheer attire.

S.J. states that while at dinner there were many other cheerleaders there celebrating and she saw them taking videos of themselves.  She claims that many other posts were shared.  S.J.'s

friend, S.E.J. was able to save one of the SnapChat posts.  However, this video and none of the other alleged snaps were ever brought to the administration's attention.

Approximately thirty minutes after S.J. posted the video, S.J. deleted the video from her SnapChat story.  She testified that she did not mean to post it and she did not think it was something appropriate for her to share with people on her SnapChat story.  However, the following day, immediately before the school assembly announcing the members of the cheer squad to the school, a former member of the cheer team advised the administration that S.J. had posted the video.  The former cheerleader had received the video from other students.  SnapChat stories can be saved and screen recorded by anyone in the SnapChat story and sent to others.

After the assembly, Reynolds, the assistant cheer coach, and the administration met and discussed the situations.  They all agreed to move forward with dismissal of S.J. and the four other students in the video from the cheer squad.  The administrators viewed the video as boasting that they had made the team to students who did not make the team.  Cutler thought the inappropriate language bordered on threatening and was informed that the video made other girls who had not been chosen to feel bullied and that S.J. and the other girls were gloating.  The following Monday, March 19, 2018, S.J., the four other girls in the video, and their parents were asked to meet with Mountain Crest's Principal, Assistant Principal, Athletic Director, and Cheerleading Advisor about the video.  The administrators stated that the video violated the Cheer Squad Constitution's social media policy and the girls were being dismissed from the team.  S.E.J.'s father recorded the meeting.

Each family also met separately with the administrators and the parents were given the lyrics sung by the girls in writing.  The four girls in the video were remorseful and asked to be allowed to return to the team.  The administrators met as a group after these individual meetings

and decided that because the four other girls were remorseful and did not record or post the video, they could be reinstated to the squad.  Later that night, the administrators contacted the parents of the four other girls who were in the video and told these parents that their daughters would be allowed back on the team if they agreed to an apology, fifty hours of community service, and a statement on appropriate social media use.  The principal then held a meeting with all the members of the cheer squad and their parents to discuss the video and the responsible usage of social media.  At the meeting, the principal explained that S.J. had posted a video of the five girls singing a song with profanity and that it was against the policy.  The four girls who were singing but did not post the video were given contracts with the conditions for rejoining the squad.  The girls signed the contracts and read an apology letter in front of the remaining team and their families.  Each of the girls has completed the conditions and been reinstated to the team.

Mountain Crest administrators did not give S.J. the opportunity to rejoin the team.  The administrators who met with S.J. and her parents noted that S.J. was unrepentant and insistent that the post was accidental and unintentional.  S.J. and her parents demanded that S.J. be allowed to be reinstated unconditionally.  However, the administrators concluded that S.J.'s explanation that she accidentally posted the video was a lie because it would require several taps, not just one, to post the video on a mobile device, and a S.J. failed to take responsibility for her actions.  The school concluded that S.J.'s reinstatement would likely cause disruption to the cheer squad for several reasons: (1) S.J.'s snap was insubordinate given the admonishment not to post anything until after the school assembly and undermined the coach's authority; (2) S.J.'s and the other girls' conduct in the video while wearing Mountain Crest cheer shirts undermined the school's efforts to rehabilitate the cheer squad's reputation; and (3) the boasting portrayed in the

video had the potential to create discord within the cheer team and could be perceived as an act of cruelty in violation of the cheer constitution.

The Mountain Crest Constitution in the Student Handbook encourages students to participate in extracurricular activities but reserves the right to the administration to declare a student ineligible to represent the school in any activity and revoke the right of participation in an activity if the student fails to uphold the school's and/or the particular group's standards. Cheerleaders are held to higher standards than other sports groups.  The administration holds cheerleaders to standards similar to school officers and views cheerleaders as school leaders, ambassadors, and the face of Mountain Crest athletics.

S.J.'s father appealed the dismissal decision to Mountain Crest's Vice Principal and Principal, who both denied his appeal.  The Principal also submitted the dispute to the Mountain Crest Executive Council, a group of students who review school decisions and provide advice and input.  Johnson's appeal letter was submitted to the council in redacted form so that the matter would be anonymous.  The council concurred in the decision to dismiss S.J. from the cheer quad for improper social media usage.

Johnson also appealed to the Cache County School District's Superintendent, who denied the request to be reinstated but allowed S.J. to be reinstated based on conditions set by Mountain Crest administrators.  Mountain Crest administrators conditioned S.J.'s reinstatement on doing fifty hours of community service, apologizing to the cheer squad, preparing a research-based presentation on improper social media usage, and meeting with administrators regarding a positive plan to move forward.  The school officials presented these terms to Johnson in the form of a contract and Johnson asked if these terms were negotiable.  The school officials told him that they were the only option for S.J. to return to the squad, and Johnson unambiguously rejected the

terms for reinstatement. However, the school has left open the possibility for S.J. to rejoin the cheer squad at any time if she completes the reinstatement conditions.

S.J. has not been punished by the school for her SnapChat video. No discipline notes have been placed in S.J.'s school record. There are no restrictions on her academic activities and she is free to tryout for or participate in any other extracurricular activity for which she qualifies.

Johnson filed the present action under 42 U.S.C. § 1983 and § 1988, alleging a violation of S.J.'s First Amendment free speech rights and a violation of S.J.'s Fourteenth Amendment's due process rights to have clear restrictions on her free speech rights.

## LEGAL ANALYSIS

### Plaintiff's Motion for Preliminary Injunction

Plaintiff moves for a preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, ordering Defendants to immediately restore S.J. to her prior status on the cheer squad and forbidding Defendants from punishing S.J. for her out-of-school speech while this suit is pending. Plaintiff contends that S.J.'s SnapChat post is protected by the Free Speech Clause of the First Amendment because she created it outside of school and shared it with only 30-40 SnapChat friends and Defendants could not punish her for the post. Defendants, however, argue that S.J. was dismissed from the cheer squad and given conditions for her reinstatement because her conduct violated the directions of her coach, undermined her coach's authority, subverted the squad's goal of improving its reputation, and she failed to take responsibility for the post or show any remorse for posting it.

## I. Preliminary Injunction Standard

A preliminary injunction is an "extraordinary and drastic remedy." *Warner v. Gross*, 776 F.3d 721, 728 (10th Cir. 2015). Preliminary injunctive relief is appropriate if the moving party

establishes: "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *Roda Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). Because a preliminary injunction is an extraordinary remedy, the "right to relief must be clear and unequivocal." *SCFC LLC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991).

In the Tenth Circuit, certain types of injunctions are disfavored: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Schrier v. University of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005) (quoting *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004)). "Such disfavored injunctions 'must be more closely scrutinized to assure that the exigencies of that case support the granting of a remedy that is extraordinary even in the normal course.'" *Id*.

Defendants assert that Plaintiff is seeking a disfavored mandatory injunction. Plaintiff argues that the injunction preserves the status quo. The status quo for purposes of a preliminary injunction is "the 'last peaceable uncontested status existing between the parties before the dispute developed.'" *Schrier*, 427 F.3d at 1260. In this case, the last peaceable uncontested status between the parties was when S.J. was on the Mountain Crest cheer squad. Therefore, the court agrees that the requested preliminary injunction to reinstate S.J. to the cheer squad preserves rather than disturbs the status quo, regardless of whether S.J. is legally entitled to such reinstatement.

However, Defendants argue that Plaintiff's requested preliminary injunction is a

9

disfavored injunction because it is mandatory rather than prohibitory.  "'Although mandatory injunctions also *generally* alter the status quo, that is not always the case.'"  *Schrier*, 427 F.3d at 1260 (citations omitted).   An injunction is mandatory if it will  "affirmatively require the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction."  *Id.* at 1261.  The Tenth Circuit has recognized that "[t]here is no doubt that determining whether an injunction is mandatory as opposed to prohibitory can be vexing."  *O Centro*, 389 F.3d at 1006.  "'In many instances, this distinction is more semantical than substantive.  For to order a party to refrain from performing a given act is to limit his ability to perform any alternative act; similarly, an order to perform in a particular manner may be tantamount to a proscription against performing in any other.'" *Id.* (citation omitted).

Although Plaintiff maintains that the injunction would not be a mandatory one because the request is limited to withholding punishment of S.J. during the pendency of the case, Plaintiff's injunction requires Defendants to reinstate S.J. to the cheer squad without conditions. In *Schrier*, the court found that the preliminary injunction requiring reinstatement of a university faculty member to the department chair position was a mandatory injunction.  *Id.* at 1246. However, the *Schrier* court also found that reinstatement would place the court in a position where it may have to provide supervision.

In this case, the court fails to see how it would have to supervise the school and district personnel in this case if S.J. was reinstated to the cheer squad.  To the extent that Plaintiff's injunction could be viewed as asking this court to reinstate S.J. to the squad and prohibit the school and district from punishing her for the prior SnapChat and any future SnapChat posts, the requested injunction would put the court in the position of supervising potential future discipline.

Therefore, the injunction would be mandatory and subject to closer scrutiny.  However, to the extent that Plaintiff's injunction seeks a ruling requiring the school to withhold punishment for the prior SnapChat post during the pendency of the litigation but not prohibiting future potential posts, the requested injunction would not require ongoing court supervision.  In that case, the injunction would not be mandatory and the court would not subject it to closer scrutiny.  The court does not believe that Plaintiff is seeking an injunction against punishment for any future SnapChat post .  Therefore, the court will not impose closer scrutiny.  Nonetheless, the court notes that the traditional preliminary injunction standard that requires Plaintiff to demonstrate that the right to relief is clear and unequivocal is "extraordinary even in the normal course." *O Centro*, 389 F.3d at 975.

## II.  Irreparable Harm

Plaintiff argues that in the absence of immediate injunctive relief, S.J. will suffer, and already has suffered, irreparable harm.  "[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *New Mexico Dep't of Game & Fish v. United States Dep't of Interior*, 854 F.3d 1236, 1249 (10th Cir. 2017). Therefore, "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Id.*

Under Tenth Circuit law, "[i]rreparble harm is not harm that is merely serious or substantial. . . . The party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).  "The question is not just whether [plaintiff] faces a concrete and imminent injury, but whether such an injury will be irreparable without the injunction." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012).

"A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001).

Plaintiff alleges that her injury is irreparable because she cannot be punished for exercising her First Amendment rights. The Tenth Circuit recognizes that "'[w]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.'" *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) (finding irreparable injury after plaintiff made a strong showing that he was likely to prevail on his Establishment Clause case). The Supreme Court has stated that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Although cases have recognized an assumption that a violation of constitutional rights includes irreparable harm, that presumption is not absolute. While recognizing the *Elrod* Court's language in the First Amendment context, the Tenth Circuit has found that "[i]t is necessary, however, to consider the specific character of the First Amendment claim." *Heideman*, 348 F.3d at 1190. Injunctive relief is not necessary when a restriction on speech is minimal and where it "leaves ample capacity to convey" the speaker's message. *Id.*

Plaintiff argues that the court need not determine the success of the claim for this prong and relies almost entirely on the presumption of irreparable harm in the case of a First Amendment violation. That argument presupposes success on the First Amendment claim while at the same time claiming that the court should not look at the merits. In essence, Plaintiff asks the court to presume success on the merits of the First Amendment claim in order to apply the presumption of irreparable harm. The Tenth Circuit's decision in *Heideman* requires the court

12

"to consider the specific character of the First Amendment claim," not just apply a presumption of a First Amendment violation.

In this case, Defendants asked the new cheerleaders to wait to post anything about making the cheer squad until the next day when the school would announce it at an assembly. The school administrators explained that eighteen girls did not make the team, they would be hurting, and the new cheerleaders should not gloat or boast about making the team. Also at the new member meeting, another new cheerleader explained how hard it had been for her the year before when she had not made the team. Basically, the school was seeking a fairly small buffer of time for these children to deal with the results. The school's request was undoubtedly a restriction on the new cheerleaders' free speech during that window of time, but the question is whether it violated S.J.'s First Amendment rights.

Plaintiff cites to *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) for the proposition that social media use is constitutionally protected speech. While the Court recognized social media networks as a prime location for First Amendment speech, *Packingham* merely held that a law making it a crime for registered sex offenders to access any social networking sites violated the First Amendment because the restriction was too broad. *Id.* at 1736-37. *Packingham* does not stand for an unfettered, unlimited right to say anything on social media without consequence. Significantly, the *Packingham* decision recognized that laws can place limited restrictions on speech, such as a 100-foot buffer around voting locations. *Id.* at 1373-38.

In this case, the school officials did not prevent the girls from any social media access or posts between the new member meeting and the school assembly. The new cheerleaders were merely asked not to post anything during that time frame about making the cheer squad. S.J. was

disciplined because she posted something to SnapChat during that time frame that the cheer

coach and school administrators viewed as being boastful about making the team and hurtful to

the girls who did not make the squad.  The new cheerleaders in S.J.'s video were in Mountain

Crest shirts that they had received for making the cheer squad, and the school officials believed

that fact would be readily understood by anyone viewing the post.  Although the school officials

asked the girls to refrain from posting about their selection to the cheer squad, they did not

generally monitor the new cheerleaders' social media that night.  A former cheerleader brought

the post to their attention, and the school officials felt that they needed to be responsive in that

situation.

Whether S.J.'s dismissal from the team and conditions for reinstatement to the team

violate her First Amendment rights and have caused S.J. to be irreparably harmed relates to one

isolated SnapChat post that occurred during a time when Defendants sought to limit the new

cheerleaders' free speech.  Plaintiff does not allege that S.J. intends to post anything

inappropriate to SnapChat in the future.  Nor does Plaintiff claim that Defendants are doing any

kind of general monitoring of S.J.'s social media accounts.  Defendants have a policy that states

that it is permissible for them to dismiss a cheerleader for inappropriate social media usage.  The

only use of that policy, at least presented to the court, has been to dismiss S.J. for posting during

the window between the new cheerleader social and the school assembly.  The court has nothing

before it demonstrating that S.J. was disciplined only for the use of profanity on social media,

only that she was disciplined for using profanity to boast about making the team before the new

cheerleaders were announced at a school assembly the next day.

Plaintiff's claims of irreparable harm all relate to S.J. not being on the cheer squad.

Although she cites to cases finding that students have only limited windows for participating in

sports, the cases she relies on are distinguishable because the students in those cases did not have the option of being back on the team. Plaintiff admitted in the reply memorandum that compliance with the conditions for reinstatement "would take [S.J.] a very short period of time." But Plaintiff's counsel stated at the hearing that S.J. will not complete the conditions for reinstatement because S.J. will not admit that she did anything wrong.

By completing the conditions for reinstatement, however, S.J. could have ensured that she was on the team for the duration of the lawsuit. It is "'well-settled that a preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted.'" *Safari Club Intern. v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012) (citations omitted) (finding no irreparable harm where ranchers refused to avail themselves of permitting regulations already in place). S.J. cannot argue that her irreparable harm relates to not being on the team when she refuses to avail herself of the means for being on the team.[2] To the extent that S.J.'s harm is doing community service, apologizing, and writing a report on social media use, she can be monetarily compensated for her inconvenience or loss of free time at trial. *Heideman*, 348 F.3d at 1189. Juries routinely compensate plaintiffs for those types of harm. The court, therefore, concludes that such harm is not irreparable.

As the case progresses, S.J. also faces the possible argument from Defendants that they would have dismissed her from the team in any event for lying to them about "accidentally" posting the video. All the administrators testified in their declarations that it was clear to them that she was lying. If she would have received the same harm–dismissal from the team–for

---

[2] Plaintiff cannot argue that completing the conditions for reinstatement would moot her First Amendment claims because Plaintiff could still be compensated for completing the conditions. Moreover, if Plaintiff's position is that reinstatement to the team would provide S.J. with all the relief she seeks, then this motion would be a disfavored injunction that is subject to a higher burden.

something unrelated to exercising her First Amendment rights, it is difficult to find her harm irreparable.

To the extent that Plaintiff argues that S.J. is irreparably harmed because the cheer squad's policy not to post inappropriate content on social media subjects her to continuing censorship of her protected, private speech,  Plaintiff has not shown that the alleged censorship is "great or substantial" as is required for irreparable harm.  *Heideman*, 348 F.3d at 1189.  S.J. has no specific plan to post anything inappropriate in the future and it is a condition of participating in an extracurricular activity, not a condition on her right to attend school.

Plaintiff distinguishes S.J.'s case from *Heideman*, arguing that her right to use profanity on a private SnapChat story cannot be compared to an exotic dancer's right to nude dancing. Plaintiff asserts that nude dancing is not constitutionally protected speech.  *Id.*  But the level of protection for S.J.'s speech is quite low as well.  It is not abundantly clear that a minor has a constitutional right to use profanity to an audience of other minors or that limiting that right as a condition of being a school leader is great or substantial harm.

"The First Amendment guarantees wide freedom in matters of adult public discourse." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986).  But "'the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings.'"  *Morse v. Frederick*, 551 U.S. 393, 404-05 (2007).  While S.J. was not physically at school when she made the post, she made the post when her cheer coach had asked her not to post, it was perceived to be boasting about making the team, potentially bullying to girls who did not make the team, and while S.J. was wearing a cheer shirt.  As such, it is possible that the post was made within the school context even if not on school grounds.  *See Doninger v. Niehoff*, 527 F.3d 41, 48-49 (2d Cir. 2008) (denying injunctive relief to student disqualified from running for

class office because of social media blog).

In addition, with respect to the profanity in S.J.'s video, even an adult's free speech rights to use profanity can sometimes be curtailed in the presence of children or if they are considered to be fighting words. The Court's "First Amendment jurisprudence has acknowledged limitations on the otherwise absolute interest of the speaker in reaching an unlimited audience where the speech is sexually explicit and the audience may include children." *Fraser*, 478 U.S. at 684. The *Fraser* Court explained that the Federal Communications Commission can regulate indecent but not obscene language that is broadcast at a time when "'children were undoubtedly in the audience.'" *Id.* at 684-85 (citations omitted). The *Fraser* Court reiterated that profanity "offends for the same reasons that obscenity offends" . . . . Such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'" *Id.* at 685 (citations omitted). The *Fraser* Court also recognized that "[s]urely it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse." *Id.* at 683. While the Supreme Court has recognized that the so-called "vulgar" speech the student made at a school assembly in *Fraser* would be protected in a public forum outside the school context, the speech contained no profanity and the definition of "school context" may be broader than simply "on school grounds." *Morse v. Frederick*, 551 U.S. 393, 405 (2007). In *Cohen v. California*, 403 U.S. 15 (1971), the court upheld an adult's First Amendment right to be free from criminal prosecution for wearing a coat that said "Fuck the Draft" in the halls of a public courthouse, but the Court acknowledged that its decision did not impact "states [which] are free to ban the simple use, without a demonstration of additional justifying circumstances, of so-called 'fighting words.'" *Id.* at 20.

Although this court recognizes that the *Fraser* Court was addressing what it considered a vulgar metaphor in a school assembly, it is not particularly clear that a minor has an absolute protected right to use profanity to other minors without fear of discipline from an extracurricular activity when it could be construed by school administrators as bullying to those who did not make a team or fuel to the fire of a rivalry. Considering the *Fraser* Court's discussion of how an adult's right to use profanity in front of children is not always protected and the *Cohen* Court's acknowledgment that fighting words can be banned, the level of protection for the speech in this case is quite low. This is not a case involving a minor engaged in political speech. It is a minor using profanity to an unknown group of "followers," which may have included other students who did not make the cheer squad. While Plaintiff argues that the lyrics were not directed at anyone in particular, the school administrators had to respond to a complaint about the lyrics and believed that some other students could have felt the lyrics were directed at them. These are the kinds of factual disputes that can be sorted out in discovery, but at the preliminary injunction stage, the restrictions at issue on S.J.'s minimally protected speech appear to be less than would be necessary for finding irreparable harm.

For these reasons, the court cannot conclude that Plaintiff has clearly and unequivocally demonstrated that S.J. will suffer irreparable harm in the absence of a preliminary injunction reinstating her to the cheer squad and striking down the cheer squad policy that dismissal from the squad is permissible for the inappropriate use of social media. However, even if the court were to apply the presumption of irreparable harm in this case or determine that any restriction of S.J.'s free speech rights amounted to irreparable harm, Plaintiff would still need to meet the remaining three elements for a preliminary injunction.

## III.  Likelihood of Success on the Merits

Plaintiff brings claims for violation of her free speech rights under 42 U.S.C. § 1983.

While Section 1983 "does not provide any substantive rights" of its own, it provides "a method

for vindicating federal rights elsewhere conferred by those parts of the United States Constitution

and federal statutes that it describes."  *See Chapman v. Houston Welfare Rights Org.*, 441 U.S.

600, 617 (1979); *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).

### A.  First Amendment Punishment Claim

Plaintiff argues that schools cannot punish students for private, out-of-school speech that

does not cause substantial, material disruption to school activities.  As discussed above, while

students do not "shed their constitutional rights" to free speech and expression at the school door,

"'the constitutional rights of students in public school are not automatically coextensive with the

rights of adults in other settings.'" *Morse v. Frederick*, 551 U.S. 393, 396-97 (2007) (quoting

*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986)).  "The rights of students 'must be

applied in light of the special characteristics of the school environment.'" *Id.*  "By choosing to

'go out for the team,' [students] voluntarily subject themselves to a degree of regulation even

higher than that imposed on students generally, [and] have reason to expect intrusions upon

normal rights and privileges." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657 (1995).  "It is

well-established that students do not have a constitutional right to participate in extra-curricular

activities." *Lowery v. Euverard*, 497 F.3d 584, 588 (6th Cir. 2007).

The Supreme Court has recognized four circumstances in which schools may regulate

student speech.  First, a school may restrict speech if it "materially and substantially disrupt[s]

the work and discipline of the school." *Tinker*, 393 U.S. at 513.  Second, a school may restrict

vulgar or offensive speech made on campus in furtherance of its mission to "inculcate the habits

and manner of civility" and to "teach students the boundaries of socially appropriate behavior."
*Fraser*, 478 U.S. at 681, 683, 685.  Third, "expressive activities that students, parents, and
members of the public might reasonably perceive to bear the imprimatur of the school," such as a
school newspaper, may be regulated "so long as [the school's] actions are reasonably related to
legitimate pedagogical concerns."  *Kuhlmeier*, 484 U.S. at 271, 273.  Finally, schools may punish
speech advocating illegal drug use, or the threat of the physical safety of students.  *Morse*, 551
U.S. at 424-25.

Plaintiff contends that *Tinker* is the controlling case for purposes of analyzing the facts in
this case.  *Tinker*, which involved students wearing armbands to protest the Vietnam War,
recognized that the First Amendment limits the government's power to punish students for
political speech.  393 U.S. at 506.  *Tinker* allows a school to restrict a student's personal, non-
school-sponsored expression where the conduct, "in class or out of it, which for any
reason–whether it stems from time, place, or type of behavior–materially disrupts classwork or
involves substantial disorder or invasion of the rights of others."  393 U.S. at 513.  If the speech
"materially and substantially interfere[s] with the requirements of appropriate discipline in
operation of" the school program, then the speech is not protected.  *Id.* at 509.
"[U]ndifferentiated fear or apprehension of disturbance" or a "mere desire to avoid discomfort
and unpleasantness" is "not enough to overcome the right to freedom of expression."  *Id.* at 337-
38.  However, "*Tinker* does not require certainty that disruption will occur," "only that the
forecast of substantial disruption be reasonable."  *Lowery*, 497 F.3d at 584.

In this case, S.J.'s SnapChat video was not political commentary or related to a public
issue.  In fact, it could be viewed as more vulgar than the offensive speech in *Fraser*.  It is thus
subject to lesser protection than the "nondisruptive, passive expression of a political viewpoint in

*Tinker*." *Fraser*, 478 U.S. at 680.  Plaintiff views S.J.'s speech as merely celebratory.[3]  However, when the speech reached other students at the school, it was brought to school officials' attention and some viewed it as not only boasting but possibly bullying to girls who did not make the team.

In addition, Defendants response to the speech is based more on its effect on the school than the profane content.  Regardless of the profanity used, Defendants have done an effective job of demonstrating how S.J.'s video was perceived by school administrators as undermining the basic educational mission of the school and cheer team.  The cheer coach, principal, student handbook, and cheer constitution reinforce the importance of courtesy, character, honor, and humility.  The school emphasized the need for this year's cheer squad to overcome a history of negative behavior and the potential escalation of a sometimes violent rivalry with Ridgeline.  S.J.'s conduct violated the standards discussed at the cheer meetings and the post itself was a direct violation of the cheer coach asking the new members of the squad to refrain from posting to social media prior to the assembly the following day.  The cheer coach and administrators were attempting to minimize conflict between their students, provide a small buffer time for students to deal with not making the team, and ensure that nothing escalated the rivalry with Ridgeline.  These are the types of judgment calls school administrators make day in and day out to ensure the orderly functioning of schools.

Moreover, the school administrators deemed S.J.'s subsequent claim that she accidentally posted the video to be a lie and a failure to take responsibility for what she had done.  The parties

---

[3]  Plaintiff's reply memorandum states that S.J. and her friends were merely singing along to the radio.  However, the court can take judicial notice of the fact that the lyrics the girls were singing were not being played on public airwaves.  The *Fraser* Court explained that FCC restrictions on such lyrics are banned when children will undoubtedly be in the audience.

demonstrated at the hearing that it takes at least two taps on the telephone to post a video to a SnapChat story, which makes it unlikely that it could be done accidentally.  The administrators meeting with S.J. knew the process for posting a SnapChat story and found S.J.'s claim to be disingenuous.  S.J.'s response to the administrators compounded the problem and provided administrators with another reason for removing her from the squad.  The fact that S.J. gave administrators a separate basis for dismissing her from the squad impacts her likelihood of success on the merits.

The school contends that S.J.'s SnapChat video had the effect of materially and substantially disrupting the work and discipline of the cheer squad in a variety of ways.  The video undermines the authority of the cheer coach to set a direction for the team.  The coach told the new members of the squad not to gloat, to be nice, and not to post anything to social media about making the cheer team until the formal announcement was made at the school assembly the following day.  S.J.'s offensive post in Mountain Crest cheer shirts could have easily been seen by administrators to be insubordination.  The video undermined the goal of the cheer squad to improve the squad's reputation, ran the risk of fueling the rivalry between Mountain Crest and Ridgeline, and had the potential of causing conflict between students at Mountain Crest.  S.J. has not demonstrated that it was unreasonable for the school to regulate such conduct.  It is a minimal restriction on minimally protected speech.

The sanctions imposed–dismissal from the cheer squad unless she took actions to make amends–minimizes the constitutional harm.  There is a difference between excluding a student from participation in a voluntary extracurricular activity and disciplining or suspending a student from class.  *Lowery*, 497 F.3d at 599-600.  A school may be prohibited from suspending a student for expressing opinions, but it is not prohibited from dismissing the student from

participation in that activity when their actions are insubordinate.  *Id.*  When a student "fail[s] to comply with the obligations inherent in the activities themselves," removal from the activity is appropriate.  *Doninger*, 527 F.3d at 52.

S.J. has no constitutional right to be a cheerleader and, although the school cannot infringe upon S.J.'s constitutional rights, the school can impose certain restrictions on her right to be on the squad.  The school considers cheerleaders to be the face of Mountain Crest athletics. Because of their high profile, Mountain Crest holds cheerleaders to a higher academic and conduct standard than other athletes.  Cheerleaders are held to the standards for student body officers and are listed in the student handbook as student leaders.  S.J. failed to comply with her coach's directions regarding social media.  Cases involving suspension are inapplicable to this case where S.J. was merely dismissed from an extracurricular activity.  In addition, by deciding that she will not comply with the school's conditions for reinstatement, S.J. has voluntarily decided not to be part of the cheer squad.

Plaintiff relies on *B.L. by Levy v. Mahoney Area Sch. Dist.*, 289 F. Supp. 3d 607, 613 (M.D. Pa. 2017), in which the court granted a preliminary injunction to a cheerleader who was dismissed from her high school cheer squad for posting a "snap" of herself holding up her middle finger with the text "fuck school fuck softball fuck cheer fuck everything."  The picture was taken during the weekend at a local convenience store, did not mention the high school or picture the high school, and the cheerleader was not engaged in any kind of school event.  The court concluded that "the ability of a school to punish lewd or profane speech disappears once a student exits school grounds."  *Id.*  The court noted that the Third Circuit has not offered a separate standard for cases where students were removed from an extracurricular activity rather than suspension and it refused to consider the difference that may be present based on the

difference in punishment. *Id.*

However, *B.L.* did not involve a specific situation where students were asked by a coach and school officials not to post a certain message for a limited period of time. The insubordination of S.J.'s post makes her case more akin to *Lowery* and *Doninger*. In addition, the *B.L.* court found it notable that B.L. was not in attire connecting her to the school. In this case, administrators believed that S.J. and the other girls were recognizably in Mountain Crest attire. The court recognizes that there are apparently divergent cases on the issues before the court. However, that emphasizes to the court that the rulings in such cases are fact-intensive and can turn on slight differences in the factual situation presented.

Moreover, this court disagrees with the *B.L.* court's failure to consider the difference between a school suspension and participation in an extracurricular activity. "By choosing to 'go out for the team,' [students] voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally, [and] have reason to expect intrusions upon normal rights and privileges." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657 (1995); *Doninger*, 527 F.3d at 53. The court finds the cases recognizing the distinction between school suspension and participation in an extracurricular activity to be more persuasive given that there is no constitutional right to participate in an extracurricular activity.

This case raises very interesting First Amendment issues for our social media age. It does not fit squarely within any of the student speech cases that have made their way to the Tenth Circuit or Supreme Court. Are there students across the country using profanity on social media? Yes. Are some of those students cheerleaders? Yes. Do those cheerleaders have the absolute right to remain on the cheer squad without consequences for such posts when they are sent to other students at the school? This court cannot answer that question clearly and unequivocally

yes, especially in the factual scenario in which S.J. made her post.  Even if S.J. had not used

profanity, she could have been disciplined for insubordination, lying to administrators, and

failing to take responsibility for her actions.  This case is not merely about the use of profanity.

In denying a preliminary injunction to a student disqualified from running for student

office because of a blog post calling administrators "douchebags" for canceling an event and

urging students to contact a school official in order "to piss her off more," the *Doninger* court

provided a conclusion that aptly applies to the present case:

> [Plaintiff], by all reports, is a respected and accomplished student
> at LMHS.  We are sympathetic to her disappointment at being
> disqualified from running for Senior Class Secretary and
> acknowledge her belief that in this case, "the punishment did not
> fit the crime."  We are not called upon, however, to decide whether
> the school officials in this case exercised their discretion wisely.
> Local school authorities have the difficult task of teaching "the
> shared values of a civilized social order" – values that include our
> veneration of free expression and civility, the importance we place
> on the right of dissent *and* on proper respect for authority.
> Educators will inevitably make mistakes in carrying out this
> delicate responsibility.  Nevertheless, as the Supreme Court
> cautioned years ago, "[t]he system of public education that has
> evolved in this Nation relies necessarily upon the discretion and
> judgment of school administrators and school board members,"
> and we are not authorized to intervene absent "violations of
> specific constitutional guarantees."

527 F.3d at 54.  Also, as in *Doninger*, the court is "mindful that, given the posture of this case,

[the court] has no occasion to consider whether a different, more serious consequence than

disqualification from student office would raise constitutional concerns."  *Id.* at 53.

School administrators must exercise discretion on a daily basis.  The administrators'

decision in this case to condition S.J.'s return to the cheer squad on a few easily accomplished

tasks for an insubordinate and inappropriate post to other students while in Mountain Crest attire

is not a clear and unequivocal violation of S.J.'s free speech rights even though she was off

school property when it was made.  The court recognizes that some critical facts could be uncovered or clarified during discovery which could result in a favorable result on the free speech claim for Plaintiff.  However, at the preliminary injunction stage, and based on the facts currently before the court, the court concludes that Plaintiff has not met the high standard required of demonstrating a likelihood of success on the merits.

### B.  Vagueness Challenge

Plaintiff argues that the Cheer Constitution is vague and overbroad and gives school officials too much discretion to censor student speech.   A restriction on speech violates the First Amendment if it is so vague that it does not allow a person of ordinary intelligence to determine what conduct it prohibits, or invites government officials to enforce it in an arbitrary and discriminatory way.  *Hill v. Colorado*, 530 U.S. 703, 732 (2000).  "'Facial challenges are strong medicine, and thus we must be vigilant in applying a most exacting analysis to such claims.'" *Taylor*, 713 F.3d at 40 (quoting *Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 (10th Cir. 2006).

In *Taylor*, the Tenth Circuit recognized that school policies must be viewed "in the unique context of public schools."  713 F.3d at 51.  The cheer rule is not subject to the same constitutional standards as a law.  *Id.* at 50.  There are many types of social media posts that could be inappropriate in a public school setting, and the school administrators are in a position to determine whether something is inappropriate in the unique context of public schools.  S.J. was given a lot of explanation and instruction on the topic before she posted her video.  She also testified that she deleted the post thirty minutes after posting it because she did not think it was appropriate.  There is no convincing evidence before the court that the rule is unworkable or unintelligible to those subject to it or those who need to enforce it in order to support a facial

challenge of the rule.

Moreover, Plaintiff's overbreadth argument is not particularly relevant to the preliminary injunction motion. Plaintiff's motion seeks S.J.'s reinstatement, which has nothing to do with the Cheer Constitution's rule regarding inappropriate social media usage. S.J. has chosen not to fulfill the conditions to rejoin the team and the rule is not currently applicable to her. However, even if she does rejoin the team, S.J. has not alleged that she plans to engage in future inappropriate social media. Moreover, there is no evidence that a facial challenge is necessary rather than an as applied challenge. Therefore, the court concludes that Plaintiff has failed to demonstrate a likelihood of success on the merits of this claim.

## IV.  Balance of Harms

Plaintiff contends that Defendants will suffer no harm by allowing S.J. to rejoin the cheerleading squad and to exercise her First Amendment rights on her own time. While Defendants have no legitimate interest in suppressing cheerleaders' First Amendment rights outside of the school context, the case hinges squarely on what the "school context" means. Defendants contend that S.J. does not have a constitutional right to participate in extracurricular activities and she is not free to speak in a way that undermines the cheer coach's authority and continue to cheer. Defendants also assert that the cheer program will be harmed if S.J. is temporarily reinstated because the officials who set the conditions for her return will be undermined and the girls who completed the conditions for returning will likely be resentful. They claim that reinstatement sends a message that insubordination must be permitted and the team's goals are of no consequence.

The bulk of S.J.'s harms come from not being on the cheer squad. S.J. is being restricted from the activity of her choice because she does not believe she should have conditions placed on

her return.   However, she could have already rejoined the squad by completing the conditions set

by the school.  Because she could alleviate most of the harm to herself, the court concludes that

S.J. has not shown that her harms outweigh the harms to the school and the whole squad as

outlined by Defendants.  Therefore, this element weighs against the issuance of preliminary

injunctive relief.

## V.  Public Interest

Plaintiff relies on cases stating that "it is always in the public interest to prevent the

violation of a party's constitutional rights."  *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir.

2012).  However, Defendants point out that the public also has an interest in the orderly

operation of the public school system.  Plaintiff's motion impacts the discretion our society gives

to school officials to run public schools and potentially sows discord among the members of the

cheer squad, the members of the cheer squad and the school administrators, and even the

members and advisors of all extracurricular activities at Mountain Crest.

An injunction in this case would certainly be in S.J.'s personal interest and in the interest

of any school cheerleader who wishes to be free from any regulations on his or her conduct.

However, given the factual circumstances of this case, it is not clear that Defendants infringed

S.J.'s rights when they dismissed her from the squad and placed conditions on her return.  The

court finds the issues presented in Plaintiff's motion to be both interesting and difficult.  While

the court does not wish to discourage citizens from coming to court to vindicate their rights, the

court also does not want to weaponize students and parents who disagree with the routine and

difficult decisions that school administrators need to make every day.  The court cannot get in the

business of running schools or refereeing disputes between students and extracurricular advisors.

There are public interests on both sides of the issue in this case, and the court concludes that this

element does not weigh in favor of either party.

For the foregoing reasons, the court concludes that Plaintiff has not met the burden of demonstrating that S.J. is clearly and unequivocally entitled to preliminary injunctive relief during the pendency of this litigation.  Plaintiff has not demonstrated a likelihood of success on the merits of the claims or that S.J. will be irreparably harmed if a preliminary injunction does not issue.  In addition, Plaintiff fails to establish that the balance of harms weighs in S.J.'s favor. Accordingly, the court denies Plaintiff's motion for a preliminary injunction.

## CONCLUSION

Based on the above reasoning, Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction [Docket No. 33] is DENIED.

DATED this 3rd day of July, 2018.

BY THE COURT:

DALE A. KIMBALL
United States District Judge